UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. C05-0810JLR |
| Plaintiff, | ORDER |
| v. | |
| DAVID L ELMORE, et al., | |
| Defendants. | |

## I.    INTRODUCTION

Before the court at this time is Plaintiff United States of America's motion for summary judgment (Mot. (Dkt. # 100)), and Defendant David Elmore's cross-motion for summary judgment (Resp. (Dkt. # 104)).  Having reviewed the submissions of the parties, the record, and the relevant law, and having heard oral argument on July 10, 2012, the court GRANTS in part and DENIES in part the Government's motion for summary judgment (Dkt. # 100) and GRANTS in part and DENIES in part Mr. Elmore's cross-motion for summary judgment (Dkt. # 104).

ORDER- 1

1          **II.    BACKGROUND AND PROCEDURAL HISTORY**

2          Mr. Elmore did not file federal income tax returns for tax years 1987-1993, and

3    Revenue Agent Don K. MacGillivray conducted an examination of Mr. Elmore's tax

4    liabilities in 1994.  (1st MacGillivray Decl. (Dkt. # 102) ¶ 4.)  Agent MacGillivray states

5    that he reviewed "(1) King County property records, (2) financial transaction reports and

6    copies of checks [he] requested from Seafirst Bank, and (3) other documents and

7    information reported to the IRS by third parties . . . via information returns."  (1st

8    MacGillivray Decl. ¶ 5.)  Information returns are documents that must "be filed with the

9    IRS to report certain business transactions," and they include Form 1099-MISC,

10   Miscellaneous Income, Form 1099-S, Proceeds from Real Estate Transactions, and Form

11   W-2, Wage and Tax Statements.  (*Id.* at ¶ 6.)  The data from such submitted reports is

12   stored in the IRS's Information Return Master File ("IRMF").  (*Id.*)  Agent MacGillivray

13   reviewed the IRMF reports regarding Mr. Elmore, and found Forms 1099-MISC and a

14   Form 1099-S.  (*Id.* at ¶¶ 7-8.)  Agent MacGillivray states that he determined that Mr.

15   Elmore received unreported income during tax years 1987-1993, using "property records,

16   bank information, and [those] information return reports."  (*Id.* at ¶¶ 9-10.)

17         Two pieces of property have been the subject of court orders in this case.  The first

18   of these, the Renton Property, is only relevant in the instant matter to the extent that the

19   proceeds from its sale were used to offset the money owed to the IRS.[1]  The second

20

21         [1] Early in the litigation, Elmore filed a motion for a temporary restraining order or
     preliminary injunction (Dkt. # 2) regarding "an unimproved parcel of property in Renton,
22   Washington ("Renton Property")" (5/18/05 Ord. at 2).  Elmore was clearly the owner of the

1   property, the Kent Property, is both the source of the unreported rental income (2nd

2   MacGillivray Decl. (Dkt. # 112) ¶ 6) and the property against which the Government

3   brought this action to establish its right to reduce the assessments to a judgment (5/18/05

4   Ord. (Dkt. # 7) at 1).   The Kent Property, which Mr. Elmore has provided to the IRS as

5   his mailing address (Compl. (Dkt. # 1) ¶ 5), is "a four-plex located at 413 Prospect

6   Avenue North, Kent, Washington 98031" (Compl. (Dkt. # 1) ¶ 8).

7          The Government alleges that the Kent Property was a source of rental income.

8   Agent MacGillivray states that, as part of his examination to determine the rental income

9   for 1987-1992, he "made a field call to the . . . property and spoke with a tenant," who

10  stated that the units rented at $300 per month and that the rent was paid to Mr. Elmore.

11  (2nd MacGillivray Decl. ¶ 6.)   Agent MacGillivray also states that his review of King

12  County property records indicated that "[Mr.] Elmore had an ownership interest in the . . .

13  property, dating back to at least 1986, most likely through an unrecorded deed.   In

14  particular, the property records showed that, in 1986, . . . Gloria Elmore, in connection

15  with their divorce . . . transferred her interest in the . . . property to . . . [Mr.] Elmore via a

16  Quit Claim Deed."   (*Id*.)

17

18

19  Renton Property, and the government had "levied unpaid tax assessments against that property"
    and seized it, and the government intended "to sell it at auction on May 25, 2005, all pursuant to
    its levy and distraint authorization under 26 U.S.C. § 6331."   (*Id*.)   Although the Renton Property

20  was not part of this litigation, the court considered "Elmore's motion in order to ensure that there
    is no manifest injustice in the seizure and sale."   (*Id*.)   The court concluded that there would be
    no manifest injustice in the planned sale and denied the motion.   (*Id*. at 3.)   The Renton Property

21  was sold, and the proceeds, totaling $54,000, were credited towards "Elmore's outstanding
    federal income tax liabilities" on May 23, 2005.   (4th Baker Decl. (Dkt. # 103) ¶ 7; *id*. Ex. A

22  (Dkt. # 103-1) at 7.)

1    As part of this litigation, the Government has sought "to establish that [Mr.

2  Elmore] is the actual owner" of the Kent Property.  (5/18/05 Ord. at 1.)  On July 13,

3  1983, James Gooding and Defendant Charon Gooding conveyed the property to

4  Defendant Stephen Hehr.  (Auchterlonie Decl. Ex. H (Dkt. # 101-8) at 2.)  Mr. Hehr

5  granted the Goodings a deed of trust, dated July 30, 1983, on the land, securing

6  performance of the agreement and payment of $49,000.  (*Id*. Ex. I (Dkt. # 101-9) at 2.)

7  Mr. Hehr gave a written statement to the IRS, dated July 21, 1997, (Auchterlonie Decl.

8  ¶ 11) stating that he "terminated all interest in said property" on February 23, 1994 (*id*.

9  Ex. J (Dkt. # 101-10) at 2).  As proof of this transfer, he submitted a real estate tax

10  supplemental statement, signed by Mr. Hehr as grantor and Mr. Elmore as grantee, which

11  stated,

12      No money or other valuable consideration of any kind is being paid by the
        grantee to the grantor in exchange for the transfer of this real property.  An
13      assumption of debt is taking place whereby the grantee is becoming
        personally and principally liable for payment of the existing debt on this
14      property.

15  (*Id*. at 3.)  In a jointly stipulated motion filed October 7, 2005, Mr. Hehr disclaimed any

16  interest in the Kent Property and the parties requested that he be dismissed as a

17  Defendant.  (10/7/05 Stip. (Dkt. # 24) at 1-2.)  The court ordered that he be dismissed on

18  October 12, 2005.  (10/12/05 Stip. & Ord. (Dkt. # 26) at 1.)

19      To clarify the interest of Charon Gooding, she and the United States agreed that

20  the amount owed to her "pursuant to the Promissory Note has priority over any and all

21  claims of the United States and all other parties."  (12/14/05 Stip. (Dkt. # 31) at 2.)  The

22

1    court confirmed Ms. Gooding's interest and dismissed her as a Defendant on December

2    16, 2005.  (12/16/05 Stip. & Ord. (Dkt. # 32) at 3.)

3          On December 12, 1994, the IRS issued a Notice of Deficiency for tax years 1987-

4    1992.  (1st MacGillivray Decl. Ex. A (Dkt. # 102-1).)  On April 14, 1995, it issued a

5    Notice of Deficiency for tax year 1993.  (1st MacGillivray Decl. Ex. B (Dkt. # 102-2).)

6    On May 8, 1995, the IRS made assessments against Mr. Elmore for tax, penalties, and

7    interest for tax years 1987-1992.  (*See* Auchterlonie Decl. Exs. A-F (Dkt. # 101-1 - 101-

8    6).)  On October 16, 1995, the IRS made assessments against Mr. Elmore for tax year

9    1993.  (*Id*. Ex. G (Dkt. # 101-7).)

10         On March 5, 1996, the United States recorded a Notice of Federal Tax Lien in

11   King County, Washington.  (Auchterlonie Decl. ¶ 12; *id*. Ex. K. (Dkt. # 101-11).)  It

12   refiled the Notice of Federal Tax Lien on May 31, 2005.  (*Id*. ¶ 13; *id*. Ex. L. (Dkt. # 101-

13   12).)

14         On April 29, 2005, the Government filed a complaint to reduce federal tax and

15   penalty assessments to judgment and to foreclose federal tax liens against Mr. Elmore.

16   (*See* Compl.)  On December 14, 2005, the Government filed a motion for summary

17   judgment.  (1st Mot. (Dkt. # 30).)  The Government submitted verified copies of Form

18   4340 for each of the tax years from 1987 to 1993, but it did not submit any of the

19   evidence underlying those assessments.  (*See* 4/29/09 Ord. (Dkt. # 87) at 2.)  On March 2,

20   2006, the court granted in part and denied in part the motion.  (*Id*.)  It held that the seven

21   tax assessments against Mr. Elmore were valid, because "a Form 4340 is presumptive

22   evidence of a procedurally valid assessment," and Mr. Elmore had not rebutted the

1   presumption.  (3/2/06 Ord. (Dkt. # 40) at 5, 8.)  The court further held, however, that the

2   Government had to "provide adequate evidence that it [had] complied with statutory

3   formalities, and that this is a case that warrants foreclosure" before it would grant the

4   motion to foreclose on tax liens on the Kent Property.  (*Id*.)

5         On March 21, 2006, the Government filed a second motion for summary

6   judgment.  (2nd Mot. (Dkt. # 45).)  "The court granted the Second Motion, concluding

7   that the Government's 1996 liens . . . were valid and that the Government was entitled to

8   foreclose."  (4/29/09 Ord. at 2-3.)  The court entered judgment on March 14, 2008, and

9   Mr. Elmore filed his notice of appeal on March 24, 2008.  (*Id*. at 3.)

10        On appeal, the Government concluded that it had erred in arguing that Forms 4340

11  alone were sufficient to establish the presumption of correctness in cases involving

12  unreported income.  (4/29/09 Ord. at 3.)  On October 10, 2008, the Government filed a

13  motion asking the court whether it would consider a Federal Rule of Civil Procedure

14  60(b) motion for relief from final judgment, to which the court indicated its willingness

15  on January 16, 2009.  (*Id*. at 4.)  On February 17, 2009, the Ninth Circuit remanded the

16  case so that the court could consider the Rule 60(b) motion.  (*Id*.)  Because the

17  Government did not file its motion until March 20, 2009, more than a year after the court

18  entered judgment on March 14, 2008, the motion was barred by the one-year limitation of

19  Rule 60(c)(1).  Fed. R. Civ. P. 60(c)(1).  As the Ninth Circuit had remanded the "case

20  'for the limited purpose of enabling the district court to consider appellee's . . . 60(b)

21  motion,'" which would include reviewing the timeliness of the motion, and the Ninth

22

1   Circuit had not altered the judgment in a way that might trigger a new, one-year

2   limitations period, the court denied the Rule 60(b) motion.  (*Id.* at 8.)

3       On appeal, the Government confessed the error that the assessments involving

4   unreported income lacked the necessary factual foundation.  (9th Cir. Mem. (Dkt. # 91) at

5   4).  "Because the district court's grant of summary judgment was based in part on this

6   presumption of correctness," the Ninth Circuit vacated the judgment and remanded the

7   case for further proceedings.  (*Id.* at 4-5.)

8       On March 2, 2012, the Government filed the present motion for summary

9   judgment.  (*See* Mot.)  The Government argues "that there are no genuine issues of

10  material fact as to (1) whether defendant David L. Elmore . . . is indebted to the United

11  States for unpaid assessed tax, penalties, and interest, plus additional unassessed penalties

12  and interest as provided by law, and (2) whether the United States is entitled to foreclose

13  its federal tax liens upon defendant's real property."  (*Id.* at 1.)  It requests that the court

14  grant its motion for summary judgment; enter judgment in its favor in the amount of

15  $727,114.06, plus additional interest and penalties accruing since March 31, 2012; and

16  "[o]rder the United States to submit a proposed Order of Sale of the subject property

17  within 30 days."  (*Id.* at 10.)

18      On March 23, 2012, Mr. Elmore filed a response and cross-motion for summary

19  judgment.  (*See* Resp.)  Mr. Elmore argues that the Government's motion for summary

20  judgment should be denied because it has not submitted the necessary factual foundation

21  for the presumption of correctness to attach to the assessments, and because the

22  assessments are arbitrary and erroneous.  (*Id.* at 10, 13-14.)  Mr. Elmore asserts that,

ORDER- 7

1  because the Government cannot produce the minimal factual foundation for the

2  presumption of correctness to attach to the assessments, it cannot establish by a

3  preponderance of the evidence that Mr. Elmore is liable.  (*Id.* at 22.)  Accordingly, Mr.

4  Elmore asks for summary judgment in his favor because the Government cannot meet its

5  burden of proof at trial.  (*Id.*)  Mr. Elmore argues that the motion for summary judgment

6  as to the liens on Mr. Elmore's home should be denied because (1) the tax assessments

7  are invalid and (2) because "the Government's liens were released according to their

8  express terms on June 7, 2005 for tax years 1987-1992, and on November 15, 2005 for

9  tax year 1993."  (*Id.*)

### III.   ANALYSIS

11        There are two issues in this case: (1) whether Mr. Elmore is liable for the taxes

12  assessed and (2) whether the United States is entitled to foreclose on the Kent Property.

13  The court will first review the standard for summary judgment, then the United States'

14  motion regarding the liability issue, then Mr. Elmore's cross-motion on the liability issue,

15  and finally the United States' motion to foreclose on the Kent Property.

### A.   Summary Judgment Standard

17        Summary judgment is proper "if the movant shows that there is no genuine dispute

18  as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

19  Civ. P. 56(a).  The court draws "all reasonable inferences supported by the evidence in

20  favor of the non-moving party."  *Satey v. JPMorgan Chase & Co.*, 521 F.3d 1087, 1091

21  (9th Cir. 2008) (citations and quotations omitted).

22

1        The moving party has the initial burden of producing evidence or of showing the

2  absence of evidence, and it has the burden of persuasion on the motion. *Nissan Fire &*

3  *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The moving party

4  may meet its burden of production by producing "evidence negating an essential element

5  of the nonmoving party's" case or by showing "that the nonmoving party does not have

6  enough evidence of an essential element of its claim or defense to carry its ultimate

7  burden of persuasion at trial." *Id.* at 1106. The moving party must first have "made

8  reasonable efforts . . . to discover whether the nonmoving party has enough evidence to

9  carry its burden of persuasion at trial." *Id.* at 1105. Then, the moving party "need only

10  point out that there is an absence of evidence to support the nonmoving party's case."

11  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citations and quotations

12  omitted).

13        If the moving party carries its initial burden of production, the nonmoving party

14  "must produce evidence to support its claim or defense." *Nissan*, 210 F.3d at 1103. The

15  nonmoving party "must provide . . . evidence that set[s] forth specific facts showing that

16  there is a genuine issue for trial." *Devereaux*, 263 F.3d at 1076 (internal quotations and

17  citations omitted). If the nonmoving party does not "produce enough evidence to create a

18  genuine issue of material fact, the moving party wins the motion for summary judgment."

19  *Nissan*, 210 F.3d at 1103.

20

21

22

**B.      Whether Mr. Elmore is Liable for the Assessed Taxes, Penalties, and Interest**

   1.  Presumption of Correctness

The Government bears the burden of proof in an action to collect tax, but it "can usually carry its initial burden . . . merely by introducing its assessment of tax due." *United States v. Stonehill*, 702 F.2d 1288, 1293 (9th Cir. 1983).  The Government's "method of calculating . . . income is presumptively correct and will be affirmed as long as it is rationally based." *Cracchiola v. Comm'r of Internal Revenue*, 643 F.2d 1383, 1386 (9th Cir. 1981).  Consequently, the Government's "deficiency determination is normally entitled to a presumption of correctness." *Rapp v. Comm'r of Internal Revenue*, 774 F.2d 932, 935 (9th Cir. 1985).

This presumption attaches to an assessment involving unreported income, however, only where "it is supported by a minimal evidentiary foundation." *Stonehill*, 702 F.2d at 1293; *Rapp*, 774 F.2d at 935; *Hardy v. Comm'r of Internal Revenue*, 181 F.3d 1002, 1004 (9th Cir. 1999) ("Commissioner must base the deficiency on some substantive evidence that the taxpayer received unreported income . . . [f]or the presumption to apply.").  Such a factual foundation "is laid once some substantive evidence is introduced demonstrating that the taxpayer received unreported income." *Id*. (citation and quotations omitted).  Defending "the integrity of the assessments," however, means "supplying the necessary factual basis to show that [the assessments] are not utterly without foundation." *Id*. at 1294.

Once the Government has "introduce[d] some evidence linking the taxpayer with income-producing activity, the burden shifts to the taxpayer to rebut the presumption by

1   establishing by a preponderance of the evidence that the deficiency determination is

2   arbitrary or erroneous."[2]  *Rapp*, 774 F.2d at 935; *Cracchiola*, 643 F.2d at 1385 ("taxpayer

3   has the burden of proving the Commissioner's method to be wrong").  "Where an

4   assessment is based on more than one item, the presumption of correctness attaches to

5   each item."  *Stonehill*, 702 F.2d at 1294.  If the taxpayer proves that one of those items is

6   in error, the presumption is destroyed as to that single item, but "the remaining items

7   retain their presumption of correctness."[3]  *Id.*  If the taxpayer proves error that

8   _____

9       [2] In his reply brief, Elmore errs in his interpretation of precedent.  (Reply (Dkt. # 114) at
10   6-9).  He states that the three steps of the analysis are as follows: (1) the government bears the
     initial burden of proof, and is entitled to the presumption of correctness only where it is
11   supported by a minimal factual foundation; (2) once the government introduces a minimal
     factual foundation, the burden shifts to the taxpayer to show that the assessment is arbitrary or
12   erroneous, and the presumption applies only when the taxpayer fails to offer evidence of
     arbitrariness; (3) the burden falls on the taxpayer to prove different income once the presumption
13   thus attaches.  (*Id.* at 6-7.)  As discussed above, however, the steps are different: (1) the
     government bears the initial burden of proof, but is entitled to a presumption of correctness,
14   although it must be supported by a minimal factual foundation in cases of unreported income; (2)
     "[o]nce the Government has carried its initial burden of introducing some evidence linking the
15   taxpayer with income-producing activity, the burden shifts to the taxpayer to rebut the
     presumption by establishing by a preponderance of the evidence that the deficiency
16   determination is arbitrary or erroneous," *Rapp*, 774 F.2d at 935; (3) if the taxpayer shows "that a
     determination is arbitrary, excessive or without foundation," the burden shifts back to the IRS,
17   *Palmer*, 116 F.3d at 1312.  *See Hardy*, 181 F.3d at 1004-05.  Besides misconstruing the steps of
     the burden-shifting analysis, Elmore errs in arguing that the presumption attaches only if the
18   taxpayer fails to show that the assessment was arbitrary or irrational.  Rather, the cases Elmore
     cites make clear that a showing that the assessment was arbitrary, erroneous, or irrational is part
19   of rebutting the presumption.  *Rapp*, 774 F.2d at 935.  That is, it is incorrect to argue that the
     presumption only attaches if the taxpayer fails to make this showing; the presumption has
     already attached with the government's introduction of "some evidence," and the taxpayer must
     show that the assessment was arbitrary or irrational to rebut the presumption as to each item.

20
21       [3] Elmore misconstrues Ninth Circuit precedent on this point.  Citing *In re Olshan*, he
     writes, "Where an assessment is based on more than one source of income, the presumption of
22   correctness must attach to each source."  (Resp. at 14.)  The Ninth Circuit in *Olshan* in fact held
     that the bankruptcy court erred when it rejected the IRS's entire Proof of Claim when it "found
     one item of the POC to be arbitrary and excessive."  *In re Olshan*, 356 F.3d 1078, 1084 (9th Cir.

1    "demonstrates a pattern of arbitrariness or carelessness," however, such error will destroy

2    the presumption of correctness as to the entire assessment.  To thus destroy the

3    presumption in its entirety, however, there must be "a pattern of pervasive arbitrariness

4    that could infect the entire assessment."  *Id.* at 1296.  Moreover, when errors arise "from

5    taxpayers' attempts to conceal their income," such errors "will rarely rebut the overall

6    presumption of correctness."  *Id.*

7         A taxpayer may also demonstrate that an assessment is arbitrary and erroneous by

8    showing that the "assessment is utterly without foundation."  *Weimerskirch v. Comm'r of*

9    *Internal Revenue*, 596 F.2d 358, 360 (9th Cir. 1979) (quoting *United States v. Janis*, 428

10   U.S. 433, 442 (1976)).  The Government "cannot rely on the presumption in the absence

11   of a minimal evidentiary foundation."  *Id.* at 361.

12        At issue in this case is whether the Forms 4340, when "supported by the

13   Declaration of Don K. MacGillivray, the Revenue Agent who conducted the examination

14   of [Mr. Elmore] . . . as well as the Exhibits attached to that Declaration" (Mot. at 6),

15   provide the "minimal evidentiary foundation" necessary for the presumption of

16   correctness to attach to the Commissioner's assessments.  *Stonehill*, 702 F.2d at 1293.

17   Mr. Elmore argues that the United States has again failed to provide this foundation, by

18

19   2004).  The bankruptcy "court erred because '[w]here an assessment is based on more than one
20   item, the presumption of correctness attaches to each item.  Proof that an item is in error destroys
     the presumption for that single item; the remaining items retain their presumption of
21   correctness."  *Id.* (quoting *Stonehill*, 702 F.2d at 1294.)  Thus, *Olshan* does not demonstrate the
     position for which Elmore cites it.  Rather, the court in *Olshan* explained that, once the
22   assessments have been supported by a minimal factual foundation and the presumption of
     correctness has attached, the taxpayer must rebut the presumption as to each item.

1    not providing third-party payor evidence to support its statements.  (Resp. at 11.)  More

2    specifically, Mr. Elmore argues that the Government's "assessments lack foundation and

3    are arbitrary" as to "unreported income from three sources: (1) rental property income;

4    (2) self-employment income; and (3) income from the sale of property."  (Resp. at 14.)

5           For the presumption of correctness to attach, the "Commissioner must base the

6    deficiency on some substantive evidence that the taxpayer received unreported income."

7    *Hardy*, 181 F.3d at 1004; *Palmer*, 116 F.3d at 1313; *Rapp*, 774 F.2d at 935; *Delaney*, 743

8    F.2d at 671.  Here, the Government submitted the quit claim deed for the real estate upon

9    which the rental property is situated (2nd MacGillivray Decl. Ex. A (Dkt. # 112-1)),

10   IRMF reports detailing unreported 1099 Miscellaneous Income for tax years 1990-1992

11   (*id.* Ex. B (Dkt. # 112-2)), and 1099-S Proceeds from Real Estate Transactions income

12   for tax year 1993 (*id.*).[4]  The IRMF reports here "showed Forms 1099-Misc,

13

14           [4] These documents were not submitted by the government with its motion for summary

15   judgment, and had not been submitted since the case was remanded by the Ninth Circuit.  Elmore
     argues that the failure to produce such information was grounds for denial of the motion for
     summary judgment and dismissal of the government's claims.  (Resp. at 12.)  He also argues that

16   the government should not be allowed to provide additional information after its opening brief.
     (*Id.*)  In support of this position, Elmore cites *United States v. Hatfield*, a case before the

17   Northern District of Illinois, in which the court held that the government had waived arguments
     based on the evidence of tax generating activity for the purposes of its motion for summary

18   judgment because it "improperly wait[ed] until its reply brief to submit such evidence."  *United
     States v. Hatfield*, No. 94 C 50397, 1996 WL 153686 at *6 (N.D. Ill. Apr. 2, 1996).  Unlike the

19   evidence in *Hatfield*, however, the evidence submitted by the government was already in the
     record as an exhibit to the Auchterlonie declaration (1st Auchterlonie Decl. Ex. C (Dkt # 72-4)).

20   Moreover, Federal Rule of Civil Procedure 56(e) states that "the court may . . . give an
     opportunity to properly support or address" a fact a party has failed to properly support.  Fed. R.

21   Civ. P. 56(e).  If the court allows a party to present "new evidence . . . in a reply to a motion for
     summary judgment," however, "the district court should not consider the new evidence without

22   giving the [non-]movant an opportunity to respond."  *Provenz v. Miller*, 102 F.3d 1478, 1483
     (9th Cir. 1996) (citation and quotations omitted).  Elmore had the opportunity to respond in his

1   Miscellaneous Income, issued to Mr. Elmore from several different drywall and

2   construction companies, and Form 1099-S, Proceeds from Real Estate Transactions,

3   issued to Mr. Elmore from an escrow company."  (1st MacGillivray Decl. (Dkt. # 102)

4   ¶ 8.)  All that is required for the presumption of correctness to attach is "some substantive

5   evidence," *Hardy*, 181 F.3d at 1004, "a minimal evidentiary foundation," *Stonehill*, 702

6   F.2d at 1293, or a showing that the assessments "are not utterly without foundation," *id.*

7   at 1294.  With the exhibits attached to the MacGillivray declaration, the Government has

8   provided the minimal evidentiary foundation necessary for the presumption of

9   correctness to attach.[5]

10      As the Government has met its burden for the presumption of correctness to attach

11  to the assessments, Mr. Elmore must "rebut the presumption by establishing by a

12  preponderance of the evidence that the deficiency determination is arbitrary or

13  erroneous."  *Rapp*, 774 F.2d at 935.  Moreover, Mr. Elmore must overcome the

14

15

16  reply brief to his cross-motion for summary judgment.  (Reply to Cross-Mot. ("Elmore Reply")
17  (Dkt. # 114) at 4-5).)  As the information was already in the record, and would be properly
    submitted after the reply brief even if it were not already in the record, the court will consider
18  this evidence in ruling on the motion for summary judgment.

19      [5] This information is in addition to the testimony of the examining agent and the Forms
    4340, which are normally "presumptive evidence that a tax has been validly assessed."  *Huff v.*
20  *United States*, 10 F.3d 1440, 1445 (9th Cir. 1993).  In cases involving unreported income,
    however, the assessment must be supported by "some substantive evidence that the taxpayer
21  received unreported income."  *Hardy*, 181 F.3d at 1004.  In *Palmer*, the Ninth Circuit held that
    when the government's "reasonable inference" underlying its tax deficiency determination is
    accompanied by evidence linking the taxpayer to at least some of the unreported income in the
22  deficiency determination, "a sufficient evidentiary foundation has been established for the
    presumption of correctness to attach to the assessments."  *Palmer*, 116 F.3d at 1313.

1 presumption as to each item upon which the assessment is based.  *Stonehill*, 702 F.2d at

2 1294.

3       As discussed above, the Government has shown at least a minimal evidentiary

4 foundation for the assessments, such that they are not impermissible, "naked"

5 assessments.  *United States v. Janis*, 428 U.S. 433, 441 (1976) ("'naked' assessment" is

6 one "without any foundation whatsoever"); *Hardy*, 181 F.3d at 1005 (exception that

7 presumption of correctness does not attach in cases of unreported income applies only in

8 cases "when the Commissioner has failed to provide any evidentiary foundation for the

9 deficiency notice").  As there is a minimal evidentiary foundation, the assessments are

10 not "utterly without foundation," *Weimerskirch*, 596 F.2d at 360, and Mr. Elmore cannot

11 demonstrate that the assessment is arbitrary and erroneous, which would destroy the

12 presumption as to the assessments in their entirety.  The court must therefore examine

13 Mr. Elmore's arguments as to whether the assessments are arbitrary or erroneous with

14 respect to the rental property income, the self-employment income, or the income from

15 the sale of property.

16       2.  Rental Income

17       Mr. Elmore argues that the Government fails to explain how he could have earned

18 income "from 1987 to 1992 from property he did not own until 1993."  (Resp. at 15;

19 Elmore Reply at 9.)  In his second declaration, however, Agent MacGillivray states that

20 King County property records indicate that Mr. Elmore had an ownership interest in the

21 Kent Property since 1986, when "Elmore's then-wife, Gloria Elmore, in connection with

22 their divorce proceeding, transferred her interest in the 4-unit rental property to Mr.

1    Elmore via a Quit Claim Deed."  (2nd MacGillivray Decl. at 2.)  This Quit Claim Deed

2    was submitted as an exhibit to MacGillivray's Second Declaration.  (*Id*. Ex. A at 2.)  The

3    Government has "introduce[ed] some evidence linking [Mr. Elmore] with [the] income-

4    producing activity."  *Rapp*, 774 F.2d at 935.  The presumption of correctness has

5    therefore attached, and Mr. Elmore has the burden "to rebut the presumption by

6    establishing by a preponderance of the evidence that the deficiency determination is

7    arbitrary or erroneous."  *Id*.

8         Mr. Elmore argues that the method used to calculate the income is devoid of

9    support and full of speculative leaps: (1) that Mr. Elmore owned the property and

10   received rents from 1987-1992; (2) that it contained four rentable units that were fully

11   occupied for the entire period; (3) that Mr. Elmore never occupied one of the units; and

12   (4) that each tenant paid $300 per month.  (Resp. at 15.)   Agent MacGillivray, however,

13   testified that he "made a field call" to the property and "spoke with a tenant," who "stated

14   that the units were rented out for $300 a month and the rent was paid to David Elmore."[6]

15   (2nd MacGillivray Decl. ¶ 6.)  As discussed above, the Government has submitted

16   evidence that Mr. Elmore had an ownership interest in the property prior to 1993.  Given

17   _____

18        [6] Elmore argues that MacGillivray's statements are inadmissible hearsay.  (Resp. at 11.)
     As the Ninth Circuit wrote in *Hughes v. United States*, however, "Rule 56 permits the use of

19   affidavits in evaluating a motion for summary judgment. While the facts underlying the affidavit
     must be of a type that would be admissible as evidence, . . . the affidavit itself does not have to
     be in a form that would be admissible at trial."  953 F.2d 531, 543 (9th Cir. 1992).  Moreover,

20   the testimony would be admissible in demonstrating the rationality of the method used in
     establishing the assessment.  *See Ferguson v. United States*, 484 F.3d 1068, 1074 (8th Cir. 2007)

21   (out of court statement admissible "as evidence of what the IRS had relied on in making its
     assessment"); *Jones v. C.I.R.*, 903 F.2d 1301, 1303 n.2 (10th Cir. 1990) ("Hearsay is admissible

22   to support the methodology used by the Commissioner in arriving at his deficiency
     assessment.").

1   this evidence, the presumption of correctness has attached, and Mr. Elmore has the

2   burden of establishing by a preponderance of the evidence that the assessment is

3   irrational.  Mr. Elmore has failed to demonstrate that the method used by Agent

4   MacGillivray is irrational or without foundation.

5         Mr. Elmore also argues that the Quit Claim Deed from Gloria Elmore fails to

6   show what interest she had to transfer.  (Elmore Reply at 9.)  This argument again misses

7   the point.  The burden of proof is on Mr. Elmore, and the Government only had to

8   provide "some evidence linking" Mr. Elmore to the "income-producing activity."  *Rapp*,

9   774 F.2d at 935.

10        Mr. Elmore further argues that "Mr. Hehr took the tax benefits of the property"

11  prior to 1993, such that "any rental income should be ascribed to Mr. Hehr, not Mr.

12  Elmore."  (Elmore Reply at 9.)  To show this, Mr. Elmore cites to the 2002 Property

13  Description in the IRS File, which states that "[Mr.] Hehr took the tax benefits of the

14  property . . . [f]or the first several years." (3rd Hobbs Decl. Ex. A (Dkt. # 115) at 8.)

15  There may be a question about the admissibility of this statement at trial, because the

16  context indicates that it was made by a dismissed Defendant to a former Revenue Officer

17  working on the case, which was then related to a subsequent revenue officer, who

18  transcribed it.  Even if the statement were admissible, however, it would not support the

19  position asserted by Mr. Elmore.  The full statement reads, "According to what Hehr told

20  the prior Revenue Officer, Elmore was a 'silent partner' in the acquisition of the property.

21  For the first several years, Hehr took the tax benefits of the property and Elmore worked

22  on improving the property."  (3rd Hobbs Decl. at 8.)  As Hobbs was the "silent partner"

1    and Mr. Elmore was the one working on the property, this passage does not aid Mr.

2    Elmore in proving that the Government erred in assessing him for the rental income.

3           Mr. Elmore objects that "Agent MacGillivray's 'field call' provides no support for

4    the assessment of rental income" for the period from 1987-1992, because Agent

5    MacGillivray fails to state when the field call took place and thus fails to support that

6    there were four tenants paying $300 per month to Mr. Elmore for all those years.

7    (Elmore Reply at 10.)  This argument fails because it attempts to reverse the burden of

8    proof from Mr. Elmore to the Government.  The Government has presented sufficient

9    evidence for the presumption of correctness to attach, and Mr. Elmore now has the

10   burden to show that the method used to assess the income was irrational or erroneous.

11   Implied accusations that Agent MacGillivray fabricated the field call because it is

12   nowhere referenced in his field notes, and citations to later field calls where the

13   investigative notes suggest that Mr. Elmore was living in the property in 2001, 2002, and

14   2005, do not meet Mr. Elmore's burden of proof.  (*See id.*)  The agent employed a

15   rational method to assess the income, and Mr. Elmore has not shown that a more accurate

16   method was available.  *See Stonehill*, 702 F.2d at 1295 (discussing *Gasper v. Comm'r*,

17   225 F.2d 284, 285 (6th Cir. 1955), where the court concluded that using the mark-up

18   method of determining income for a small pub was arbitrary because the number of

19   bottles consumed of each type of liquor, the number of drinks per bottle, and the prices

20   per drink was known).  "Some error is unavoidable in such a reconstruction. . . . Errors

21   arising from the taxpayers' attempts to conceal their income will rarely rebut the overall

22   presumption of correctness." *Stonehill*, 702 F.2d at 1296.

1    Finally, Mr. Elmore argues that the rental income assessment for 1987-1992 is

2   arbitrary because another agent removed it from the assessment for 1993.  (Elmore Reply

3   at 11.)  In a memorandum dated April 4, 1995, Agent Terlow states that the rental income

4   for 1993 was removed because there was "[n]o information in file that [Mr. Elmore]

5   owns rental complex or rented out or if rented how $300/month was determined or

6   whether [Mr. Elmore] was living in one unit."  (Hobbs Decl. Ex. A at 384.)  Four months

7   earlier, on December 12, 1994, however, the IRS issued a Notice of Deficiency for the

8   1987-1992 tax years that included that income, as did the assessment for the 1987-1992

9   tax years that was made less than a month later, on May 8, 1995.  (1st MacGillivray Decl.

10  Ex. A; Auchterlonie Decl. Exs. A-F.)  The record does not demonstrate why the

11  investigating agent and those reviewing  his conclusions found enough evidence to assess

12  the rental income for the earlier years and not for 1993.  The Government is not required

13  to explain the difference, however.  There is enough evidence for the presumption of

14  correctness to attach for the rental income for 1987-1992.  Neither this argument, nor any

15  of the above arguments in combination, raise enough evidence to rebut the presumption

16  of correctness by a preponderance of the evidence.  Mr. Elmore cannot just rely on the

17  conclusory argument that the assessment remained for the earlier years because of

18  "bureaucratic inertia."  (Elmore Reply at 11.)

19      3.  Self-Employment Income

20      Mr. Elmore argues that there is no third-party payor information, or any other

21  substantive information, to support the assessment for self-employment income from

22  1987-1993.  (Resp. at 17.)  He argues that the administrative file does not include any

1   Form 1099, even if such forms were sufficient on their own.  (*Id.*)  He implies that the

2   IRMF summaries would not be admissible evidence, but argues that they would hurt the

3   Government's case even if they were admissible because there are no summaries for the

4   1987-1989 tax years and there are discrepancies between the summaries and the income

5   assessed for the 1992-1993 tax years.  (*Id* at 18.)  He also argues that there are "[n]o

6   workpapers, calculations, or explanations for the" estimates, even though "[c]ourts

7   require a rational methodology to estimate unreported income."  (*Id*. at 19; Elmore Reply

8   at 8.)

9          The Government does not need to provide substantive evidence linking Mr.

10   Elmore to the unreported, self-employment income for each of the tax years from 1987-

11   1993.  In *Palmer*, a case dealing with statistical methods used to reconstruct unreported

12   income, the Ninth Circuit wrote, "Where the government's deficiency determination rests

13   on the reasonable inference that the taxpayers must have had sufficient income to support

14   themselves for years when no income was reported, and statistics are used to reconstruct

15   income, the evidentiary foundation necessary for the presumption of correctness to attach

16   is minimal."  *Palmer v. U.S. I.R.S.*, 116 F.3d 1309, 1313 (9th Cir. 1997).  Moreover,

17   "[w]hen this reasonable inference is coupled with . . . information linking [a taxpayer] to

18   wages for at least part of the . . . period [during which no income was reported], a

19   sufficient evidentiary foundation has been established for the presumption of correctness

20   to attach to the assessments."  *Id*.

21          Here, as in *Palmer*, the court may rely on the reasonable inference that Mr. Elmore

22   must have had "sufficient income to support" himself for the years from 1987-1993.  *Id*.

ORDER- 20

1   Moreover, the IRMF demonstrates that Mr. Elmore had income for the 1991-1993 tax

2   years.  (*See* 2nd MacGillivray Decl. Ex. B at 2-9.)  This "information linking [Mr.

3   Elmore] to wages for at least part of the" period for 1987-1993, coupled with the

4   reasonable inference that he had to have income to support himself, provides a sufficient

5   foundation for the presumption of correctness for the assessments as to all the years.

6   *Palmer*, 116 F.3d at 1313.

7        Mr. Elmore argues, however, that *Palmer*, in the portion of the opinion where the

8   court discusses the statistical methods that can be used to estimate income, cuts against

9   the Government's case here, as the Government "failed to employ statistics or some other

10  rational basis to extrapolate income for the missing years."  (Elmore Reply at 8, 11-12.)

11  It is true that the Government does not claim to use statistics like those discussed in

12  *Palmer* in creating the assessments here.  Rather, while the IRMF no longer contains all

13  the transcripts, Agent MacGillivray states that he "reviewed and relied upon" IRMF

14  reports, like those for tax years 1990-1993, "in making [his] assessment determinations

15  for each of the years at issue."  (2nd MacGillivray Decl. at 2-3.)  Using the summaries of

16  income in the IRMF to reconstruct Mr. Elmore's earned, unreported income for those tax

17  years is a rational method for assessing Mr. Elmore's income.  *See Palmer*, 116 F.3d at

18  1313; *Ferguson v. United States*, 484 F.3d 1068, 1077 (8th Cir. 2007) (method for

19  making assessment should be reasonable and logical).

20       Mr. Elmore also argues that the Forms 1099 that are summarized in the IRMF are

21  not "sufficient evidence alone for the presumption of correctness to attach."  (Resp. at 17

22  (citing *Portillo v. C.I.R.*, 932 F.2d 1128, 1134 (5th Cir. 1991)).)  In *Portillo*, the court

1   held that the deficiency determination was arbitrary and erroneous because it relied on a

2   Form 1099 without further investigation to determine if the income reported by the third

3   party was supported in any way. *Id.* That case differs from this one, however, because

4   Portillo had filed a Form 1040, reporting a different income, and the Government

5   "arbitrarily decided to attribute veracity to" the Form 1099 and assume that the Form

6   1040 was false. *Id.* The Fifth Circuit has subsequently limited this precedent: the IRS

7   "has no duty to investigate a third-party payment report that is not disputed by the

8   taxpayer," as by "a Form 1040 or any other document in which they swore that they did

9   not receive the payments in question." *Parker v. C.I.R.*, 117 F.3d 785, 787 (5th Cir.

10   1997). Thus, the logic underlying the *Portillo* decision does not aid Mr. Elmore as he has

11   not provided a sworn document asserting a different income for the years at issue.

12         Mr. Elmore also implies that the IRMF transcripts of Forms 1099 are inadequate.

13   (*See* Resp. at 18.) He states that the IRMF transcripts "suggest[] that Forms 1099 . . .

14   may have been filed in <u>some</u> years," but that it "is impossible to determine" if such forms

15   were really filed "without the forms themselves." (*Id.*) Under Federal Rule of Evidence

16   803(6), the IRMF transcripts would be admissible at trial.[7] Because the IRMF transcripts

17

18   ───────────────

19         [7] Rule 803(6) requires that a "record be made at or near the time . . . from information
     transmitted by . . . someone with knowledge," that "the record [be] kept in the course of a
     regularly conducted activity," that "making the record was a regular practice of that activity,"
20   that these conditions be shown by the testimony of a qualified witness, and that nothing about the
     source of the information or "the method or circumstances of preparation indicate a lack of
21   trustworthiness." Fed. R. Evid. 803. While MacGillivray's second declaration does not testify
     as to these conditions, such records are prepared in the ordinary course of IRS business activities
     and his or another agent's testimony would establish this at trial. *See Hughes v. United States*,
22   953 F.2d 531, 543 (9th Cir. 1992) ("Rule 56 permits the use of affidavits in evaluating a motion

1   would be admissible at trial under Rule 803(6), the best evidence rule would not require

2   submission of the original Forms 1099.

3        Mr. Elmore also notes discrepancies between the IRMF records and the income

4   assessed for tax years 1992 and 1993.  Mr. Elmore states that the notice of deficiency

5   states that there was $33,169.00 in income for tax year 1992, while the IRMF only shows

6   $15,358.00 in income for that year, and that the notice of deficiency states that there was

7   $20,897.00 in income for tax year 1993, while the IRMF shows only $1,194.00 in income

8   for that year.  (Resp. at 18.)  He further argues that these discrepancies, combined with

9   the lack of IRMF transcripts for 1987-1989, shows that the assessments are arbitrary.  (*Id.*

10  at 19.)

11       With respect to the income for 1993, which was assessed at $20,897.00, Mr.

12  Elmore cites to the IRMF reports with Bates numbers 402-03 to argue that the IRS only

13  has records for $1,194.00 in income.  (*See* Resp. at 18; 2nd MacGillivray Decl. Ex. B at

14  7-8; 1st Hobbs Decl. Ex. A at 33-34.)  Pages 402 and 403 bear markings, "D-1" and "D-

15  2," respectively, that Agent MacGillivray testifies he made during his investigation.  In

16  his declaration, Agent MacGillivray refers to a third page, with Bates number 404 and

17  marked "D-3."  (2nd MacGillivray Decl. ¶ 9.)  He states that "the IRMF report at Bates

18  Number 404, which [he] marked as "D-3" during [his] exam, shows total non-employee

19  compensation for that year of $20,897[.00]."  (*Id.*)  This is the figure that appears in the

20  notice of deficiency.  (*See* 1st Hobbs Decl. Ex. A at 21.)  Agent MacGillivray states that,

21

22  for summary judgment," as long as "the facts underlying the affidavit [are] of a type that would
    be admissible as evidence.).

ORDER- 23

1   in his "experience reviewing and relying upon IRMF reports, the information contained

2   in those reports is routinely updated as additional third party returns are submitted," and

3   that the "page marked 'D-3' shows that the IRMF report was updated to reflect additional

4   third-party return information."  (2nd MacGillivray Decl. ¶ 9.)  While this page is of a

5   different format than the other IRMF transcripts, it identifies the payer as Rick Lane, who

6   was identified in the IRMF transcripts for 1990-1992 as a payer, and specifies the

7   income.[8]  Agent MacGillivray testifies that this page is part of the IRMF report, and as

8   such is admissible as evidence of Mr. Elmore's income for tax year 1993.  When that

9   page is considered, there is no discrepancy between the income assessed and the IRMF

10  records for 1993.

    The discrepancy between the notice of deficiency and the IRMF reports for tax

12  year 1992 is more troubling.  The Government has given no explanation why the IRMF

13  record for Mr. Elmore has so deteriorated since Agent MacGillivray's investigation.  The

14  reports upon which Agent MacGillivray testifies that he relied for tax years 1987-1989 no

15  longer exist (*see* 2nd MacGillivray Decl. ¶ 8), and the figures in the notice of deficiency

16  for 1992 and the IRMF report for 1992 do not match (*see* 1st Hobbs Decl. Ex. A at 41

17  (assessment for 1992 of $33,169.00); 2nd MacGillivray Decl. Ex. B at 6 (records of

18  income from Forms 1099-MISC totaling $15,358.00)).  Agent MacGillivray states that,

19  based on his experience reviewing IRMF reports and in conducting examinations, "the

20

21      [8] With the addition of the income from Rick Lane, the government apparently chose not
    to not assess Elmore for the $1,194.00 in income from Geoffrey Kenway, which was listed in the
    IRMF transcript at Bates number 402 and is the income cited by Elmore to show the discrepancy
22  from the notice of deficiency.  (*See* 1st Hobbs Decl. Ex. A at 33-34.)

1    IRMF report for 1992 was updated with additional third-party return information

2    subsequent to the copy of the report . . . that exists in the administrative file today."  (2nd

3    MacGillivray Decl. ¶ 10.)  In other words, the file was updated, he relied on the updated

4    file in preparing his assessment, the updated file was lost, and all that remains in the file

5    today is a *prior*, incomplete transcript.  There is no explanation why the file should have

6    retained the update for tax year 1993, but not any update for tax year 1992.  Nor is there

7    any consideration of the possibility that the file might have been updated to eliminate

8    income upon which he relied because the additional income had been reported in error.

9    This discrepancy, without any adequate explanation for the discrepancy, indicates that the

10   assessment for tax year 1992, as well as the calculations for interest and penalties on the

11   income assessed for that year, are in error.

12        Normally, the burden of proof for the 1992 self-employment income would shift

13   back to the IRS.  *Palmer*, 116 F.3d at 1312.  While the evidence highlighted by Mr.

14   Elmore shows that the Government's assessment is excessive, it also provides substantive

15   evidence that there was unreported income for 1992.  Mr. Elmore has not shown that he

16   owes no income for that year, and when "taxpayers fail to file returns, . . . an assessment

17   is necessarily an estimate."  *Dodge*, 981 F.2d at 353.  Taxpayers in such circumstances

18   "may not complain of the inevitable inaccuracies in assessment their default occasions."

19   *Id*.  Nevertheless, "the assessment must be adjusted" for the error.  *Dodge*, 981 F.2d at

20   357; *see also Adamson v. C.I.R.*, 745 F.2d 541, 548 (9th Cir. 1984) (no basis for

21   questioning assessment when Tax Court sustained determination with appropriate

22   modifications for errors); *United States v. Schroeder*, 900 F.2d 1144, 1148 (7th Cir.

1   1990) (proof of error rebuts presumption but not taxpayer's liability, which must be

2   adjusted to coincide with the proof).  Therefore, the Government should revise the

3   assessment for 1992, including penalties and interest, in light of this error.

4        Moreover, the apparent error in the assessment for tax year 1992 does not affect

5   the Government's assessments as to the other years.  (*See* Resp. at 19.)  As discussed

6   above, the Government has provided sufficient evidence for the presumption of

7   correctness to attach to the other income assessments, and "the remaining items retain

8   their presumption of correctness" despite the error in the assessment for 1992.  *Stonehill*,

9   702 F.2d at 1294.  Moreover, this error does not "demonstrate[] a pattern of arbitrariness

10  or carelessness" that "could infect the entire assessment" and destroy the presumption.

11  *Id*. at 1294, 1296.

12        4.  Income from Sale of Property

13        In his first declaration, Agent MacGillivray referred to an IRMF report showing

14  "Form 1099-S, Proceeds from Real Estate Transactions, issued to Mr. Elmore from an

15  escrow company," and to "Seafirst Bank financial transaction reports and checks [that]

16  showed that Mr. Elmore received income from the sale of property."  (1st MacGillivray

17  Decl. ¶ 8.)  Mr. Elmore again objects that the referenced documents have not been

18  presented to the court.  (Resp. at 20.)

19        As discussed above, the IRMF reports were already submitted into the record as

20  Exhibit C to the 1st Auchterlonie declaration (Dkt. # 72-4), and they have been properly

21  resubmitted as Exhibit B to the 2nd MacGillivray declaration (Dkt. # 112-2), with time

22  for Mr. Elmore to respond, subsequent to the motion for summary judgment.  *See*

1    *Provenz*, 102 F.3d at 1483 (non-moving party must have opportunity to respond when

2    district court considers new evidence submitted with reply to motion for summary

3    judgment).

4           Mr. Elmore also argues "that the IRS File contains no factual foundation for the

5    assessment of $13,000[.00] of income from the sale of property in 1987." (Elmore Reply

6    at 13.)  The IRS certainly does not lead by example in maintaining tax records, and this

7    has made this case much more complicated than necessary.  Presumably, the records

8    upon which the assessment for income from the sale of property in 1987 was based were

9    lost in the same way that the records for self-employment income from 1987-1989 were

10   lost.  As discussed above, the arguments presented in *Palmer* are persuasive that the

11   presumption of correctness extends to the self-employment income earned in the years

12   for which there are no records.

13          *Palmer*'s logic does not sustain the Government's position with respect to the sale

14   of property income, however.  In *Palmer*, the Ninth Circuit discussed the "reasonable

15   inference that . . . taxpayers must have had sufficient income to support themselves for

16   years when no income was reported," and concluded that "[w]hen this reasonable

17   inference is coupled with . . . information linking [the taxpayer] to wages for at least part

18   of the . . . period [during which no income was reported]," there is a sufficient evidentiary

19   foundation for the presumption of correctness to attach to the assessments for income

20   during all the years.  *Palmer*, 116 F.3d at 1313.  There is no reasonable inference,

21   however, that taxpayers must have a continual stream of income from the sale of property

22   in order to support themselves.

ORDER- 27

1         This case also tests the limits of *Palmer* in another way.  *Palmer* deals with a

2    situation in which statistics had to be used to estimate income, and the IRS simply

3    estimated the income that would be necessary for the taxpayer to support himself.  Here,

4    however, the Government claims to have had evidence of self-employment income and

5    income from the sale of property and to have used that evidence in its assessments, but

6    then to have lost that evidence.  As discussed above, using the evidence of income to

7    calculate the amount Mr. Elmore earned is not an irrational method.  Nevertheless, in

8    *Palmer*, the court concluded in dicta that the use of national median household income

9    statistics to reconstruct income would likely be an irrational method, as opposed to using

10   average local income statistics or the cost-of-living statistics for a particular locale.

11   *Palmer*, 116 F.3d at 1312.  Allowing the Government to aggregate income from multiple

12   sources, without any foundation for the income from those years, would similarly risk

13   attributing more income to a taxpayer in years for which there is no substantive evidence

14   of income beyond that which would be estimated by using local income or cost-of-living

15   statistics.

16        Whether the assessment for income from sale of property in 1987 is valid comes

17   down to the testimony of Agent MacGillivray.  As discussed above, the Government's

18   deficiency determination is not enough for the presumption of correctness to attach in

19   cases of unreported income unless "it is supported by a minimal evidentiary foundation."

20   *Stonehill*, 702 F.2d at 1293.  For this income from the sale of property, the Government

21   has not provided checks, bank statements, deeds transferring title, or any other form of

22   evidence to substantiate the sale of property.  There are no IRMF transcripts of the sale of

1   the property.  The Government has not even identified the property in its filings.  The

2   Government states that its "assessment of income from the sale of property is supported

3   by evidence in the form of the examining agent's testimony as to what he relied upon,

4   and his workpapers attached to the notice of deficiency explaining the basis for the

5   assessment."  (Reply at 15.)  At least to the extent that the Government has directed the

6   court's attention, these worksheets do nothing to identify the property other than asserting

7   that there was a sale of residence for $13,000.00.  (*See* 1st MacGillivray Decl. Ex. A at 6,

8   9.)

9          As to Agent MacGillivray's testimony, as the Government argues, Agent

10  MacGillivray "is not testifying as to the contents of the third-party payor reports or other

11  documents."  (Reply at 6.)  His testimony does not provide an evidentiary foundation for

12  income that was received from the sale of property.  Moreover, even if Agent

13  MacGillivray's testimony were admissible as to the content of the statements and could

14  provide an evidentiary foundation for the various types of income, his statements are not

15  specific enough as to the income from the sale of property in 1987 to provide a

16  foundation for the assessment of that income.  (*See* 1st MacGillivray Decl. ¶¶ 5, 7-10;

17  2nd MacGillivray Decl. ¶¶ 4-5.)  The attribution of the minimal evidentiary foundation

18  for income from one year to the assessed income from another year does not apply to this

19  income under these circumstances, and there is no independent evidentiary foundation for

20  this income.  Accordingly, the court concludes that the Government erred in assessing

21  Mr. Elmore for income from the sale of property in 1987.

22

1    Regarding the income from a sale of property in 1993, Mr. Elmore argues that

2  information in Mr. Elmore's IRS file contradicts the assessment and that the presumption

3  of correctness cannot attach as to this item because of this error.  (Resp. at 20; Elmore

4  Reply at 13.)  The IRMF transcript for 1993 summarizes a Form 1099-S for the sale of

5  property, which was submitted by Burien Escrow, Inc., stating $195,000.00 in income.

6  (2nd McGillivray Decl. Ex. B at 7.)  Mr. Elmore argues that this amount is contradicted

7  by the check from Burien Escrow in the amount of $130,002.51 (1st Hobbs Decl. Ex. A

8  at 7), and a record from Seafirst Bank showing a deposit in the same amount (*id.* at 6).

9    All of these documents provide the minimal evidentiary foundation required for

10 the presumption of correctness to attach.  Accordingly, Mr. Elmore has the burden of

11 proving by a preponderance of the evidence that the assessment is in error.  He points out

12 that the check from Burien Escrow is for a different amount than the income from the

13 sale reported by Burien Escrow.  Nevertheless, as the Government argues, nothing here

14 shows how much of the total sales price Burien paid out to others on "[Mr.] Elmore's

15 behalf, such as for closing costs, realtor's fees, state and local taxes, or to pay other lien

16 holders on the property."  (Reply at 16).  Mr. Elmore has not demonstrated by a

17 preponderance of the evidence that the amount assessed is in error, and the assessment

18 here does not point to an overall pattern of arbitrariness.

19    In summation, the Government has demonstrated a "minimal evidentiary

20 foundation" for the rental income, the self-employment income, and the income from the

21 sale of property in 1993.  *Stonehill*, 702 F.2d at 1293.  Except for the self-employment

22 income for 1992, Mr. Elmore has failed to rebut the presumption by a preponderance of

1   the evidence.  *Rapp*, 774 F.2d at 935.  The IRS records for self-employment income for

2   1992, however, indicate that the income assessed for that year is excessive.  Mr. Elmore

3   cannot escape liability for his unpaid taxes for this year, but the Government must correct

4   its assessment in light of this error.  Moreover, the Government has failed to provide a

5   minimal evidentiary foundation for the income from the sale of property in 1987.

6   Accordingly, the court denies the Government's motion for summary judgment as to the

7   income from the sale of property in 1987, but grants the Government's motion for

8   summary judgment as to the other income, with appropriate corrections for the income

9   for tax year 1992.[9]

10   **C.    Cross-motion for Summary Judgment**

11       Mr. Elmore requests that the court grant summary judgment in his behalf because

12   the Government "cannot adduce evidence sufficient to establish that he is liable for the

13   taxes assessed."  (Resp. at 22.)  This request is only relevant as to the income from the

14   sale of property in 1987.  As discussed above, the Government has properly met its

15   burden for summary judgment in its favor for the other assessments.

16       As to the income from the sale of property in 1987, there is no evidence in the

17   record that such a sale ever took place or the amount of the sale, other than the

18   Government's naked assertion that Mr. Elmore earned $13,000.00 in income from the

---

19

20      [9] The other errors and inconsistencies alleged by Elmore either were not involved in calculating the assessments, are explained by the additional penalties and interest since the assessments were prepared, or have been corrected by the government.  (*See* Resp. at 20-21;

21   Reply at 16-19.)  Moreover, as the court explained in *Dodge*, when "taxpayers fail to file returns, . . . an assessment is necessarily an estimate."  *Dodge*, 981 F.2d at 353.  After failing to file his

22   returns, Elmore "may not complain of the inevitable inaccuracies in assessment [his] default" has occasioned.  *Id.*

1    sale of property. *See Weimerskirch*, 596 F.2d at 358. As Mr. Elmore has shown that this

2    assessment is without foundation, the burden shifts back to the Government to show that

3    the assessment was correct. *Hardy*, 181 F.3d at 1005. The Government appears,

4    however, to have lost all records as to Mr. Elmore's income from 1987. Moreover,

5    Agent MacGillivray's declarations cannot provide the evidence that is necessary to prove

6    the Government's case. While Rule 56 allows for the use of "affidavits in evaluating a

7    motion for summary judgment," it is necessary that "the facts underlying the affidavit . . .

8    be of a type that would be admissible as evidence." *Hughes*, 953 F.2d at 543. As the

9    documents providing the facts underlying the affidavit appear to no longer exist, there are

10   no underlying facts that would be admissible as evidence.

11       Thus, because of the Government's negligence in maintaining its records, there is

12   no evidence upon which the court can draw "reasonable inferences . . . in favor of the

13   non-moving party." *Satey*, 521 F.3d at 1091. Mr. Elmore has "point[ed] out that there is

14   an absence of evidence to support the [Government's] case," *Devereaux*, 263 F.3d at

15   1076, and the Government has failed to provide further "evidence that set[s] forth

16   specific facts showing that there is a genuine issue for trial." *Nissan*, 210 F.3d at 1103.

17   Accordingly, Mr. Elmore is entitled to summary judgment in his favor as to income from

18   the sale of property in 1987.

19   **D.    Whether the United States is Entitled to Foreclose**

20       Mr. Elmore argues that the Government's liens on his property were released on

21   June 7, 2005, for tax years 1987-1992 and on November 15, 2005, for tax year 1993.

22   (Resp. at 22; *see* Auchterlonie Decl. Ex. K (Dkt. # 101-11) at 2-3.) The tax liens state,

1    "With respect to each assessment below, unless notice of lien is refiled by the date in

2    column (e), this notice shall constitute the certificate of release of lien as defined in IRC

3    6325(a)."  (Auchterlonie Decl. Ex. K at 2-3.)  Under 26 U.S.C. § 6325, "if a certificate

4    [of release] is issued pursuant to this section by the Secretary and is filed in the same

5    office as the notice of lien to which it relates, . . . such certificate shall be conclusive that

6    the lien referred to in such certificate is extinguished."  26 U.S.C. § 6325(f)(1)(A).  Mr.

7    Elmore states that there is "no evidence that the liens were ever re-filed" and that the

8    notices of lien therefore "converted into certificates of release."  (Resp. at 23.)

9           Mr. Elmore ignores that the Government refiled the notices of tax lien, even

10   though he cites to the refiled notices.[10]  (*See* Auchterlonie Decl. Ex. K at 2-3; Elmore

11   Reply at 15.)  The liens were refiled on May 31, 2005.  (*See* Auchterlonie Decl. Ex. L at

12   2, 4.)  The Government erred, however, in refiling the notices.  In column (e) of the

13   refiled notices, the Government mistakenly used the refiling date for the original notices.

14   (*Id.*)  Accordingly, by the terms of the refiled notices, the liens were extinguished a week

15   after the notices were refiled for tax years 1987-1992, and six months after they were

16   refiled for tax year 1993.

17          The federal tax liens against Mr. Elmore's property are nonetheless valid because

18   of the distinction between Section 6321 tax liens and Section 6323 Notice of Federal Tax

19   Liens ("NOFTL").  *See In re Toledo*, 395 B.R. 794, 798 (Bankr. S.D. Fla. 2008); *In re*

20   _____

21          [10] Although Elmore cites to the original notices of federal tax lien when he argues in his
     response that that the government "present[ed] no evidence that the liens were ever re-filed," he
22   quotes the release language from the refiled notices rather than from the original notices.  (Resp.
     at 23.)

1   *Cole*, 205 F.R. 668, 672-76 (Bankr. D. Mass. 1997) (holding tax liens against taxpayer as

2   valid but NOFTL against others as extinguished absent Certificate of Revocation of

3   certificate of release); *In the Matter of Estate of Jerry Wayne Young, Sr., Deceased*, No.

4   CIVA1:09CV814-LG-RHW, 2010 WL 1427584 at *4-5 (S.D. Miss. Apr. 8, 2010);

5   *United States v. Steeley*, No. 509-CV-105-RS-EMT, 2010 WL 3055346 at *2 (N.D. Fla.

6   Aug. 3, 2010).  Under 26 U.S.C. § 6321, if a taxpayer neglects or refuses to pay a tax, the

7   amount of the tax, including interest and penalties, "shall be a lien in favor of the United

8   States upon all property and rights to property, whether real or personal, belonging to

9   such person."  26 U.S.C. § 6321.  This lien "arise[s] at the time the assessment is made

10  and . . . continue[s] until the liability for the amount so assessed (or a judgment against

11  the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason

12  of lapse of time."  26 U.S.C. § 6322.  The "tax may be collected by levy or by a

13  proceeding in court, but only if the levy is made or the proceeding begun . . . within 10

14  years after the assessment of the tax."  26 U.S.C. § 6502(a)(1).  "If a timely proceeding in

15  court for the collection of a tax is commenced, the period during which such tax may be

16  collected by levy shall be extended and shall not expire until the liability for the tax (or a

17  judgment against the taxpayer arising from such liability) is satisfied or becomes

18  unenforceable."  26 U.S.C. § 6502(a).

19         Liens under Section 6323, however, concern the priority of the Government's lien

20  as against other creditors.  The title to Section 6323 makes this clear: "Validity and

21  priority against certain persons."  26 U.S.C. § 6323.  Section 6323 states, "The lien

22  imposed by section 6321 shall not be valid as against any purchaser, holder of a security

1  interest, mechanic's lienor, or judgment lien creditor until notice thereof which meets the

2  requirements of subsection (f) has been filed by the Secretary."  26 U.S.C. § 6323(a).

3      Therefore, a federal tax lien is relevant to the taxpayer, while an NOFTL is

4  relevant to other creditors of the taxpayer.  The former is extinguished only when the tax

5  liability is satisfied or it becomes unenforceable because the statute of limitations has run.

6  The NOFTL may be extinguished, by its own terms, when the Government fails to refile

7  by the date noted.  When the latter is extinguished, however, it affects only the lien's

8  priority against other creditors; it does not invalidate the tax lien as to the taxpayer.  *See*

9  *In re Toledo,* 395 B.R. at 799; *In re Cole,* 205 B.R. at 672-73, 674; *Jerry Wayne Young*,

10  2010 WL 1427584 at *5.

11      Here, the Government assessed Mr. Elmore on May 8, 1995, for tax years 1987-

12  1992 and on October 16, 1995, for tax year 1993.  (Auchterlonie Decl. Ex. K at 2-3.)  It

13  filed its complaint on April 29, 2005.  It thereby filed a "timely proceeding in court" that

14  tolled the statute of limitations on the Section 6321 liens, 26 U.S.C. § 6502(a), and the

15  Section 6321 federal tax liens are still enforceable.

16      Section 7403 states,

17      The court shall, after the parties have been duly notified of the action,
        proceed to adjudicate all matters involved therein and finally determine the
18      merits of all claims to and liens upon the property, and, in all cases where a
        claim or interest of the United States therein is established, may decree a
19      sale of such property, by the proper officer of the court, and a distribution
        of the proceeds of such sale according to the findings of the court in respect
20      to the interests of the parties and of the United States.

21  26 U.S.C. § 7403.  The "may" in § 7403 grants a "limited equitable discretion" by which

22  district courts may balance "the possibility that innocent third parties will be unduly

ORDER- 35

1   harmed" by a judicial sale and the "Government's interest in prompt and certain

2   collection of delinquent taxes." *United States v. Rodgers*, 461 U.S. 677, 709 (1983).

3       As discussed above, Mr. Elmore has refused and neglected to pay his tax

4   liabilities. 26 U.S.C. § 6321. Liens on all Mr. Elmore's "property and rights to property"

5   arose at the time of assessment, *id.* and 26 U.S.C. § 7322, including a lien on the Kent

6   Property. The period to collect the tax assessed was tolled by a timely proceeding in

7   court. 26 U.S.C. § 6502(a). As Mr. Hehr has disclaimed any interest in the property and

8   the Government has agreed that Ms. Gooding's interest has priority over the claims of the

9   United States (10/7/05 Stip., 12/14/05 Stip.), there are no innocent third parties noted in

10  the record who would be unduly harmed by a judicial sale. The Government has

11  provided evidence that it has no other means of recovering any of Mr. Elmore's unpaid

12  tax liability other than foreclosing on his property. (1st Baker Decl. (Dkt. # 45-2) ¶ 11

13  (noting that Mr. Elmore has not paid income tax since 1994, conducts his business on a

14  cash basis, has no credit, and does not report any wages); 4th Baker Decl. (Dkt. # 103)

15  ¶ 8 (not filed since 1993).) Mr. Elmore presents no evidence or authority that would

16  justify preventing the Government from foreclosing on its liens. The court has fully

17  adjudicated the merits of the Government's tax claim. All that remains is for the

18  Government to present a proper order for judicial sale, and to properly distribute the

19  proceeds of the sale.

20              **IV.    CONCLUSION**

21      For the reasons stated above, the court GRANTS in part and DENIES in part the

22  Government's motion for summary judgment (Dkt. # 100). The court grants the motion

1    for summary judgment as to the rental income, the self-employment income, and the

2    income from the sale of property in 1993.  The court denies the Government's motion for

3    summary judgment as to the income from the sale of property in 1987.  The Government

4    may enforce its liens against the Kent Property through a judicial sale.  Within 15 days of

5    this order, the Government shall submit a proposed judgment reflecting an accurate

6    tabulation of Mr. Elmore's liability up to the date of the proposed judgment, minus the

7    proceeds from the sale of the Renton Property and adjusted for the error in the assessment

8    of the self-employment income for 1992.  The Government shall have 30 days from the

9    entry of judgment to submit a proposed order for judicial sale of the Kent Property.  The

10   court orders the Government to accompany each submission of a proposed order or

11   judgment with a clear and cogent explanation of its basis.

12        The court GRANTS in part and DENIES in part Mr. Elmore's cross-motion for

13   summary judgment (Dkt. # 104).  As described above, the court grants Mr. Elmore's

14   motion as to the income from the sale of property in 1987, but denies the motion in all

15   other aspects.

16        Dated this 12th day of July, 2012.

17

18        _____
          JAMES L. ROBART
19        United States District Judge

20

21

22

ORDER- 37